DAVID C. NIX *v.* JEFFERSON D. DICKERSON.

1. WATERS. *Riparian rights. Title to land.*
   The caving of a considerable body of land into a stream separating two counties, in consequence of floods, which changes the course of the stream so as to put the land which so caved on the opposite side in nowise affects the title of the owner.

2. SAME. *Avulsion. County boundaries.*
   The deposit of a considerable body of land, made by avulsion from the opposite side of a stream, does not affect the title thereto, although the stream be the boundary between two counties.

FROM the chancery court of Copiah county.

HON. HENRY C. CONN, Chancellor.

Nix, appellant, was complainant in the court below; Dickerson, appellee, was defendant there. From a decree dismiss-

ing the suit, complainant appealed to the supreme court. The facts are stated in the opinion of the court.

*R. N. Miller,* for appellant.

What is title by accretion? "It is where portions of the soil of real estate are added by gradual deposition through the operation of natural causes to that already in possession of the owner. And this title is called title by accretion."   .   .   .

"The difference between avulsion and accretion consists in one being done by imperceptible loss from the land of one and increasement to that of the other, and in the other its being done suddenly to an extent which can be ascertained and measured. In the case of avulsion the soils still belong to the first owner, unless he shall have suffered it to remain in its new position until it cements and coalesces with the soil of the second owner, in which case the property in the soil will be changed and no right to claim remains."

The test given by the Institutes and Fleta of what would be a sufficient annexation to the land of another to deprive the first landowner of his property in the soil, is "suffering trees to take root and spring up in the soil in its new locality."

"The test of what is gradual—that is, of what kind of addition makes accretion—as distinguished from what is sudden, seems to be that though witnesses are able to perceive from time to time that the land has encroached upon the sea line, it is enough, if it was done so that they would not perceive the progress at the time it was being made."

"Nor does it make any difference in the rights of the land-owner that the accretion upon his land is the result of artificial causes and not wholly from natural ones." 3 Wash. on Real Prop., 55, 58, 59, and notes.

"Alluvion (accretion) means an addition to riparian land gradually and imperceptibly made through causes either natural or artificial by the water to which the land is contiguous."

"The test of what is gradual and imperceptible is that

though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on." *County St. Clair* v. *Lovingston*, 23 Wall. (U. S.), 46.

" The question is well settled at common law that the person whose land is bounded by a stream of water which changes its course gradually by alluvial formations shall still hold the same boundary, including the accumulated soil. No other rule can be applied on just principles. Every proprietor whose land is thus bounded is subject to loss by the same means which may add to his territory, and as he is without remedy for his loss in this way he cannot be held accountable for his gain." *New Orleans* v. *United States*, 10 Peters, 662.

" If a river is declared by statute or other law to be the boundary between states (or counties), the river as it runs continues to be the boundary, although it may change imperceptibly from natural causes." *Butternuth* v. *St. Louis Bridge Co.*, 123 Ill., 536.

" When the water line is a boundary of a given lot that line, no matter how it shifts, remains the boundary, and a deed describing the lot conveys the land up to such shifting water line; so that in view of the accretion the water line, if named as boundary, continues to be the boundary, and a deed of the lot carries all the land up to the water line." *Jeffries* v. *East Omaha Land Co.*, 134 U. S., 179.

" The test of what is gradual and imperceptible in the sense of the rule is, that though the witnesses may see from time to time that progress has been made, they could not perceive it while the progress was going on." *County of St. Clair* v. *Lovingston*, 23 Wall., 46; *New Orleans* v. *United States*, 10 Peters, 662; *Jones* v. *Johnson*, 18 How. (U. S.), 150; *Jones* v. *Soulard*, 24 How. (U. S.), 41; *Schools* v. *Risley*, 10 Wall., 91; *Halsey* v. *McCormick*, 18 N. Y., 148; *Mulry* v. *Norton*, 100 N. Y., 424; *Hopkins Academy* v. *Dickerson*, 9 Cush.

(U. S.), 544, 545 (N. J. Law, 16 Vroom, 405); *Nebraska* v. *Iowa*, 143 U. S., 359.

The case of *Couthard* v. *Stevens*, 84 Iowa, 241 (35 Am. St. Rep., 304), is a much stronger case than this on the facts. The witnesses there (some of them) swore that the lands were formed suddenly; that "the river threw up land there in their sight in strips half a mile wide," and yet the court said, "Accretion, to vest title in the owner of the abutting shore, must be so slow that its increase should be imperceptible. (1 Am. & Eng. Ency. Law, 137). To acquire title to land as alluvion it is necessary that its increase should have been imperceptible—that is, that the amount added in each moment of time should not be perceived. It is enough if it were done so that they could not perceive the progress at the time it was being made." *Jeffries* v. *East Omaha, etc.,* *Co.*, 134 U. S., 177.; *Coulthard* v. *Stevens*, 35 Am. St. Rep., 307.

It thus appears from the above array of authorities that accretion must be so slow and imperceptible that it cannot be perceived as it progresses. It must be so gradual and imperceptible; but by gradual and imperceptible is meant that the formation need not be made in any particular time. It may be made in days, hours, months or years, but the real test is, can it be seen and its boundaries marked as it is forming?

A truer test deducible from the authorities is, that in every formation by accretion where the land lost on one side and going over to the other is incapable of identification. The mere fact that one can see the formation is growing larger at intervals does not make it any the less accretion.

There never was a clearer case of accretion than the one at bar. It is impossible to imagine a clearer case. All the witnesses agree that in a series of years the lands of Dickerson have caved off, and then this fifty-five acres in controversy has formed in such manner that no one at any period of time could even tell how much had been added or seen it form. Dickerson himself, appellee, says that it formed gradually.

The statutes, §§ 362 and 406, code 1892, makes Pearl River, with its meanderings, the dividing line between Simpson and Copiah counties. This remains the boundaries between the counties as the river shifts, and, of course, it remains the boundaries between the riparian owners. *New Orleans* v. *United States,* 10 Peters, *supra.*

The very distinction between avulsion and accretion confounded the court below and demoralized counsel for appellee. The testimony of appellee himself and all his witnesses is that no one of them could at any instant or period of time see or tell anything about the formation as it progressed.

*R. P. Willing,* for appellee.

The complainant in this case claims title to the land in controversy by virtue of the doctrine of accretion; it will therefore be necessary to ascertain the meaning of the words "accretion," "alluvion," and "dereliction." In 1 Am. & Eng. Ency. Law. (2d ed.), 467, accretion is defined to be the process of gradual and imperceptible increase of land, caused by the deposit of sand, earth, or sediment thereon by contiguous waters; accretion or alluvion is the result of the process. In the same book on p. 473, dereliction is defined as the process of gradual and imperceptible recession of water from the land, or the land thus left dry. In its latter sense, it is regarded the same in effect as alluvion, and the same principles are held to regulate both. We learn that the doctrine of accretion is taken from the civil law. In the institutes of Justinian it is said: "Moreover the alluvion soil added by the river to your land becomes yours by the law of nations. Alluvion is an imperceptible increase, and that is added by alluvion which is so gradual that no one can perceive how much is added in any one moment of time." Liber 11, tit. 1, sec. 20.

The code Napoleon declares that "accumulations and increase of mud formed successively and imperceptibly on the soil bordering on a river or stream is alluvion. Alluvion is for the

benefit of the proprietor of the shore, whether in respect of a river, a navigable stream, or one permitting floats or not. On the condition in the first place of having a landing-place or two paths conformable to the regulations." Book 2 of Property, etc., 556. The same law prevailed in France prior to the adoption of code Napoleon. 4 Nouv., Dic. de Brillon, 278. And such was the law of Spain. Part 3, tit., 28 Law, 26.

Blackstone lays down the rule of common law as follows: "As to lands gained from the sea, either by alluvion, by the washing up of sand and earth, so as in time to make *terra firma*, or by dereliction, as when the sea shrinked back below the usual water mark; in these cases the law is held to be, that if this gain be by little and little, by small and imperceptible degrees, it shall go to the owner of the land adjoining. For *de minimis non curat lex;* and besides, these owners being often losers by the breaking of the sea, or at charges to keep it out, this possible gain is therefore a reciprocal consideration for such possible charge or loss. But, if the alluvion or dereliction be sudden and considerable, in this case it belongs to the king; for, as the king is lord of the sea, and so owner of the soil while it is covered with water, it is but reasonable he should have the soil when the water has left it dry." 2 Com., 262. We are told that Mr. Blackstone obtained this definition from Bracton, Book 2, ch. 2.

Hale, in his work De Jure Maris, tells us that Bracton followed the civil law which we have above quoted from. See De Jure Maris, part 1, ch. 6; also *King* v. *Marsboro*, 1 Dow.

The same rule is laid down by Chancellor Kent. See 3 Kent Com., 428. According to Angell on Watercourses (7th ed.), p. 49, the rule of the common law on the subject of alluvion is the same as that of the civil law, and he quotes from Justinian as above. In Woolrych on the law of water, p. 29, *et seq.*, alluvion by the common law is defined to be an addition made to land by the washing of the sea, the navigable rivers or other streams, where the increase is so gradual in its prog-

ress that it cannot be perceived how much is added in any moment of time. Mr. Kent, in deciding the case of *Emans* v. *Trumbull*, 2 Johns (N. Y.), 313 (3 Am. Dec., 427), said, "The rule is, that if the marine increases by small and almost imperceptible degrees, it goes to the owner of the land; but if it be sudden and considerable, it belongs to the sovereign." This was with reference to the sea.

Mr. Woolrych defines dereliction to be "a recession of the waters of the sea, a navigable river, or other stream, by which land which was before covered with waters, is left dry. In such case, if the alteration takes place suddenly and sensibly, the ownership remains according to the former bounds, but if it is made gradually and imperceptibly, the derelict or dry land belongs to the riparian owner from whose shores or bank the water has so receded.

We thus see from a review of the above authorities that the chief characteristic of accretion is that the formation would be by gradual and imperceptible deposit. The decisions of the courts are unanimous in holding that in order for the law governing accretions to attach, the increase must have been gradual and imperceptible. 3 *Minton* v. *Steel*, 125 Mo., 181; *Gill* v. *Lydick* (Neb.), 59 N. W.; *Rep. Trustees* v. *Dickson*, 9 Cush., 5511; *Mulvy* v. *Norton*, 100 N. Y., 424; Gould on Waters, sec. 155; 3 Wash. Real Prop., 58; see Gould on Waters, p. 248, *et seq.; Jeffries* v. *East Omaha Land Co.*, 134 U. S., 178 (33, 872 L. C. P. Co.); *St. Louis* v. *Rutz*, 138 U. S., 226 (34, 941 L. C. P. Co.); *County of St. Clair* v. *Lovingston*, U. S. (90 L. C. P Co., 23, p. 59); *Jones* v. *Johnson*, 15 L. C. P. Co., U. S., p. 320; *Jones* v. *Soulard*, *Ib.*, 16, p. 604; *Schools* v. *Risley*, *Ib.*, 9, p. 850; *Hulsey* v. *McCormick*, 18 N. Y., 147; *Lynch* v. *Allen*, Am. Dec., 32, p. 671; *Hagen* v. *Campbell*, 33 Am. Dec., 267 and notes (4 Am. Rep.); *Warren* v. *Chambers*, p. 1.

A great deal has been said as to the meaning of the words "gradual" and "imperceptible." The following seems to be

the meaning of the words according to weight of authorities, to-wit: that the test as to what is gradual and imperceptible in the sense of the rule is, that though the witnesses may see, from time to time, progress has been made, they could not perceive while the process was going on. See *St. Clair County* v. *Lovingston,* above; *Jeffries* v. *East Omaha Land Co.,* above. In the *City of St. Louis* v. *Rutz,* above mentioned and referred to, the court said: "The sudden and perceptible loss of land of a riparian proprietor, which is visible in its progress, does not deprive him of his fee in the submerged land, nor change his boundaries on the river front as they existed when the land commenced to be washed away. If the bed of a stream changes imperceptibly by the gradual washing away of the banks, the line of the land bordering upon it changes with it; but if the change is by reason of a freshet, and occurs suddenly, the line remains as it was originally." I refer the court especially to this case, as in my judgment, it is exactly like the case at bar. According to the testimony of defendant's witness in this case, and counsel for the complainant expresses his entire willingness to submit this case on their testimony, the lands in controversy were formed as the result of sudden freshets and overflows, beginning with the freshet of 1886, and continuing through the freshets of 1871, 1874, and 1900. According to the testimony of Mr. J. P. Dickerson, a brother of the defendant whose memory goes farther back than any other witness in this case, as the result of the freshet of 1866, the river shifted towards the Simpson side of the entire channel of the river about 100 yards. The shifting of this channel was not the result of imperceptible and gradual washings away of the banks, the line of the land bordering upon it changing gradually and imperceptibly, but it was a sudden change by reason of an extraordinary freshet which occurred in 1866.

It is admitted that defendant owned lots 1 and 2, section 9, township 9, range 21, west, in Simpson county, and these

lots bordered on Pearl river according to the original government survey, Pearl river being beyond the ebb and flow of the tide. It is conceded that defendant owned to the middle of the bed of the stream, that is, *ad filum acquae.* See *Arnold v. Mundy,* 10 Am. Dec., 385. When the waters receded after the flood of 1866, the river had shifted its channel on the Simpson county side 100 yards, as the result of the sudden overflow of that year. We are told that these overflows lasted from twelve to fourteen days, and that just as soon as the waters receded the sandbar would appear on the other side of the river, and its lines of demarkation would be accurately determined by reason of the fact that it was composed of sand without any vegetation on it whatever. That being the case, as defendant owned to the middle of the stream, after the overflow of 1866, he still owned one-half of the old bed of the river or a strip of fifty yards in width. Then after the overflow of 1871, according to the testimony on behalf of defendant, another strip of land was left on the other side variously estimated at from twenty to thirty-five acres. This land too belonged to the defendant, because it was the result of a sudden cut off made by the river which left that much of the land on the northern side. In 1874 another strip of land belonging to defendant, variously estimated at from twenty to thirty-five acres, was left on the northern side; this, too, was the result of a sudden overflow, and not of gradual and imperceptible formation. In 1900 there was another overflow, and a strip of land belonging to defendant, estimated to be about 100 yards wide, was cut off by a change in the bed of the river and left on the northern side. The witnesses for defendant swear that in every instance just as soon as the water would begin to recede, the sandbars would appear, and that when the river would return to its ordinary channel at ordinary stage, these large bodies of land appeared on the other side. We contend that in view of the above authorities, these changes

were the result of sudden overflows, and extraordinary freshets, and were not gradual and imperceptible.

I refer again to the case of *St. Louis* v. *Rutz*, and refer the court especially to finding of fact No. 16, which the court finds as follows : "That in the floods of the Mississippi river, before mentioned, large portions of the upper northern end of said island washed away. That in such floods a bar formed each year, below, and joined to the foot of the island, extending down the river for the distance of a quarter of a mile or more; that when the water subsided after such a flood, the surface of such bar appeared in sight above the surface of the water for the greater length of such bar ; that during the summer after such bar had formed, willows grew upon it, and the flood which occurred the next succeeding spring deposited more sand and soil on the bar, which was retained by the willows, and the bar so formed was thus raised higher, and this process was repeated at each succeeding flood by the formation of another bar below that formed by the proceeding flood which in turn was covered with a growth of willows, and raised higher by each succeeding flood until it ceased to be overflowed." That court also found in the finding of facts No. 9 as follows : "And the court further finds, from the evidence that such washing away of said river bank did not take place slowly and imperceptibly ; but on the contrary, the caving in and washing away of said river bank occurred principally at the spring rises or floods of high water in the Mississippi river which usually occurred in the spring of the year ; that such rises or floods varied in their duration, lasting from four to eight weeks before the waters of the river would subside to the ordinary stage or level ; that during each year there was usually carried away a strip of land from off said river bank from 250 to 300 feet in width, which loss of land could be seen and perceived in its progress," etc.

Under the above state of facts the court held that the title to the sandbar did not pass by accretion. It seems to me that

this case is absolutely decisive of the case at bar.    In the above
case quoted it was from four to eight weeks before the waters
of the river would resume its ordinary stage, while in the case
at bar, the testimony is that the river would resume its ordi-
nary stage and the sandbar would appear on the other side
within two to three weeks.    *Lynch* v. *Allen*, 4 Devereux,
62, and also 32 Am. Dec., 671 ; *Woodbury* v. *Short*, 17 Vt.,
387 ; *Warren* v. *Chambers*, 4 Am. Rep., 1 ; *Cooley* v. *Golden*,
117 Mo., 33 ; *Gill* v. *Lydick*, 40 Neb., 508 ; *Mulry* v. *Norton*,
100 N. Y., 426.

CALHOON, J., delivered the opinion of the court.

Mr. Nix filed his bill in chancery to remove the claim of Mr.
Dickerson, as a cloud upon his title, to a certain formation of
Pearl river which he alleges to be an accretion to his land by
insensible deposit from the waters of the river.    Mr. Dicker-
son in his answer denies that this deposit was an accretion to
the land of Mr. Nix, which is on the Copiah side of Pearl
river, and asserts that, on the contrary, the deposit was caused
by avulsion from his land on the Simpson county side of the
river.

It is agreed that Mr. Nix has paid taxes on lots 3 and 4 of a
section township and range in Copiah county, as owner, and
that he is the owner of those lots to which he claims that the
deposit was an accretion.    It is also agreed that Mr. Dickerson
has title to lots 1, 2 and 3, in a section, township, and range
in Simpson county opposite the deposit, and has paid taxes on
them as owner.    There is no question here of adverse posses-
sion by anybody.    The deposit is uncultivated, and has never
been actually occupied, but it has been a pasture used by the
cattle of both parties.    It is also true that Mr. Nix has now,
intact, all the lands embraced in lots 3 and 4 in Copiah county;
he has never lost a foot of his land, but asserts that the de-
posit is an accretion to those lots of his in Copiah county.    It
is a further fact that Mr. Dickerson, who has title to lots 1, 2,

and 3 on the Simpson county side—and on which he pays taxes by land numbers—has lost fifty-three acres of his land, as he claims, by avulsion, and the deposit contains fifty-three acres. The chancellor, on the pleadings and proof, decided for Mr. Dickerson, holding that the deposit was an avulsion from his land, and dismissed the bill.

The chancellor, from the testimony, must have believed the following to be true: That, in extraordinary freshets, in various years, large parts of Mr. Dickerson's land caved in— at one time ten acres in a body; at another time one hundred yards in a body; at another time about thirty-five acres in a body. In the course of these cavings there went into the river at different times a warehouse, with corn stored in it; at another time a cotton house, and, at another time, another cotton house. That these cavings were during unusual freshets, which would last for ten days or two weeks, and after each it was plainly to be seen that about an equal deposit developed on the Copiah county side; and that, each time after these considerable additions were added to the Copiah county side, when the flood subsided, the channel of the river measured about the same width, but was shifted in position so that the old channel became dry; and the complainant, himself, stated that the new formation on his side was perceptible as soon as the water receded.

We think the chancellor's conclusion was correct on the facts, and that they show a case of avulsion, and that Mr. Dickerson did not lose his title. We do not subscribe to the doctrine that, in order to constitute accretion, it is necessary that it should be visible to the naked eye that the very particles of the caving soil were taken from the one place and deposited in another, nor do we agree to the view that it must be shown that no part, however inconsiderable, of the deposit, consisted of particles brought down by the stream, and not component parts of the land torn off by the freshet. The circumstantial evidence

in this case is overwhelming that the deposit was by avulsion from Mr. Dickerson's land caused by violent floods.

The briefs of counsel on both sides are very strong, and each supports his position by copious citations from authorities, and it is only necessary for us to announce our conclusion of the law from the facts.

*Affirmed.*